# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

LEE ROY SWAFFORD,

    Plaintiff,

v.

                               CIVIL ACTION FILE NO.:
                               4:12-CV-0220-HLM

UNITED STATES OF AMERICA,

    Defendant.

## ORDER

This is an action filed against the United States of America (the "Government") under the Federal Tort Claims Act (the "FTCA"). The case is before the Court on the Government's Motion to Dismiss [6].

# I. Factual Background

## A. Plaintiff's Allegations

Plaintiff resides in Rome, Georgia. (Compl. (Docket Entry No. 1) ¶ 4.) Plaintiff sustained injuries in a slip and fall incident that occurred at R. Shaefer Heard Campground (the "Campground"), a U.S. Army Corps of Engineers ("Corps") Campground on West Point Lake near West Point, Georgia. (Id. ¶ 1.) Specifically, on September 20, 2010, Plaintiff suffered an injury while walking his dog. (Id. ¶ 6.) According to Plaintiff, he decided to walk down to the lake area. (Id.) Plaintiff alleges that as he "descended the steps at campsite number 26 which lead to the lake area, he was suddenly pitched forward, at approximately the fourth step, by a step that had been allowed to deteriorate

2

to the point that the tread had collapsed at its connection to the riser to the step above it." (Id.) Consequently, the tread or step was not level. (Id.)

According to Plaintiff, "the defective or rotten step sloped down at the rear and jutted upward at the front of the step." (Compl. ¶ 7.) Plaintiff alleges: "When Plaintiff stepped on what he thought, and had a right to assume, would be a level step, he was thrown to his left. There was no handrail on the left side of the steps, and therefore, there was nothing for him to grab to stop his fall." (Id.) Plaintiff asserts that he "fell forward onto his right knee and then onto his left knee causing serious damage to both." (Id.) Plaintiff's injuries required surgeries and physical therapy. (Id. ¶¶ 9, 11.) Plaintiff also alleges that he suffered pain,

AO 72A
(Rev.8/8
2)

anxiety, mental anguish, and lost earnings capacity as a result of his injuries. (Id. ¶¶ 12-15.)

Plaintiff alleges that the Government, "through its agencies, owned, operated and/or controlled [the Campground]." (Compl. ¶ 10.) Plaintiff contends that the Government "had a ministerial duty to maintain and/or repair the steps at the location where Plaintiff fell." (Id.)

On January 5, 2012, and January 16, 2012, Plaintiff filed a Claim Form 95 with the U.S. General Services Administration ("GSA"). (Compl. ¶ 5.) On June 29, 2012, Plaintiff's counsel received a letter informing him that the Department of the Army had completed its investigation into Plaintiff's claim and that Plaintiff should receive a decision within the next several weeks. (Id.) Plaintiff did not receive

4

a decision concerning his claim within six months after submitting his Claim Form 95. (Id.)

## B. Evidence Presented By the Parties

### 1. Declaration of Robert Chitwood

Robert Chitwood serves as the Assistant Operation Manager for the West Point Lake Project (the "Project"), which includes the Campground. (Decl. of Robert W. Chitwood (Docket Entry No. 6-3) ¶ 1.) Mr. Chitwood avers that he is "responsible for planning, monitoring, and implementing all programs, administering contracts, managing the [P]roject's fiscal and personnel requirements, and ensuring compliance with applicable laws and regulations. (Id. ¶ 2.)

AO 72A
(Rev.8/8
2)

According to Mr. Chitwood, the Corps "does not directly handle the maintenance and repair of [the Campground]." (Chitwood Decl. ¶ 3.) Instead, the Corps "contracts with" Anderson Construction Company ("Anderson") to provide those services. (Id.) According to Mr. Chitwood, "[t]he Corps' role in project maintenance is one of broad supervision only and does not involve day-to-day supervision or control over Anderson employees." (Id.) Mr. Chitwood states that "Anderson's responsibilities include the inspection, maintenance and repair of steps as necessary to keep them in safe and working condition." (Id. ¶ 5.) According to Mr. Chitwood, Anderson's contract "requires [it] to operate under a Quality Control Plan that it developed and implemented." (Id.) Mr. Chitwood states that "[t]he

AO 72A
(Rev.8/8
2)

Corps relies on Anderson to perform these duties as assigned, and to alert the Corps if, in Anderson's opinion and findings, repair/replacement/additions are needed." (Id.)

Mr. Chitwood notes that the Quality Control Plan requires Anderson's quality control personnel to inspect the steps at issue, along with all of the Campground's facilities, annually. (Chitwood Decl. ¶ 6.) Mr. Chitwood states that during those inspections, Anderson's personnel "verify and insure that [the facilities] are safe, structurally sound, and free of obvious deterioration." (Id.) According to Mr. Chitwood, "Anderson's verification of safety would include any recommendations it had to re-build, re-structure or

7

make additions to [C]ampground facilities including the steps involved herein." (Id.)

Mr. Chitwood states that Anderson inspected the steps in January 2010 and that Anderson "reported no issues or problems with these steps, and consequently did not make any repairs or recommendations of additions to same." (Chitwood Decl. ¶ 7.) According to Mr. Chitwood, "there is no Anderson or [Corps] record/document indicating any deficiencies in or repairs recommended or made to the steps since their installation sometime between the years 1986 and 1988." (Id.)

### 2. Anderson's Contract

Anderson's contract with the Corps ("the Contract") provides, in relevant part:

8

The contractor shall provide all planning, programming, administration, management, supervision, maintenance of accurate and complete records and files, quality control inspection, personnel, materials, supplies, parts, tools, equipment and vehicles, except as otherwise provided for herein, necessary to operate and maintain Government-owned facilities and equipment at the [Project]. Work under this contract shall be performed under the general direction of the Authorized Representative of the Contracting Officer (ARCO). The contractor shall assure that all services are conducted in accordance with the contract and all applicable laws, regulations, codes, or directives. Performance shall be in accordance with all Terms, Conditions, General, Specific and Technical Provisions [("TPs")], Drawings, Attachments, Exhibits, etc. contained herein or incorporated by reference. Incorporation by reference shall include any and all mandatory provisions required by the Federal Acquisition Regulation (FAR), whether it is referenced or not, current at the time of contract award.

9

(Pl.'s Dep. Ex. 4 (Docket Entry No. 27-4) at 3.) With respect to technical provisions, the Contract describes the scope of work as:

> [t]he complete inspection, maintenance, and repair of all project buildings and structures, including mechanical, electrical, water, plumbing, water treatment, distribution, and sewage disposal systems. Services necessary to keep these facilities in a safe, neat, attractive and well maintained condition include lubrication, refastening, refitting, replacing and repairing roofs, walls, ceilings, floors, ceramic tile, windows, sky lights, vents, doors, trim, paint, partitions, building hardware and fixtures.

(Id. at 9.) With respect to other facilities, the Contract states:

> Maintenance and repair shall include, but is not limited to, sanitary disposal stations, playgrounds, play apparatus, game court equipment, bulletin boards, campsites, picnic sites, bulkheads, steps, walkways, pedestrian bridges, fishing decks, curbs, tables, grills, trail markers, etc.

10

AO 72A

(Rev.8/8

Maintenance, repair or replacement of project structures is necessary to keep them in safe working condition.

(Id.)

### 3. Deposition Testimony

#### a. The Project

The Corps operates the Project, which includes natural resources and recreational facilities. (Dep. of Steven Logan (Docket Entry No. 24) at 6.) The Project consists of 25,900 acres, including 525 miles of shoreline and approximately thirty parks. (Id. at 18.) The Project also includes a hydropower plant. (Id. at 19.) Congress authorized the Project "for hydropower, recreation, navigation, water quality, and fish and wildlife management." (Id. at 18.) Approximately 5,000 acres of the Project is accessible to

AO 72A
(Rev.8/8
2)

the public. (Id. at 19.) The Campground is part of the Project's recreational resources. (Id. at 6.)

### b. Contract with Anderson and Control Over the Facilities

The Corps contracted with Anderson to manage the maintenance program for the Property. (Logan Dep. at 21.) According to Mr. Logan, the Corps relinquished control over the Project "to a degree," meaning that "ultimately the agency is responsible, but we are responsible for assuring we have a contractor in place to manage our maintenance program." (Id. at 21.)

The Corps owns the Campground and, according to Mr. Logan and Mr. Chitwood, has not given up ownership and control of the Campground to Anderson. (Logan Dep. at 16, 20; Dep. of Robert W. Chitwood (Docket Entry

12

AO 72A
(Rev.8/8
2)

No. 26) at 40-41.) The Corps still owns the Project's campsites and its park rangers are not excluded from the campsites. (Logan Dep. at 23.)

### c. Inspecting and Repairing Campsites

Anderson representatives conduct a thorough campsite-by-campsite inspection at the Campground one or two times a year. (Logan Dep. at 13-14, 24; Chitwood Dep. at 23; Dep. of Irvin Hill (Docket Entry No. 25) at 39, 42-44.) Mr. Logan noted that Anderson representatives are "always out and doing inspections and looking and so forth." (Logan Dep. at 24; see also id. at 30 ("[T]hey are always in these parks looking at these things.").) According to Mr. Logan, if Anderson representatives notice defects or problems, "then they go through their work order process and arrange

13

to repair those deficiencies." (Id. at 25; see also id. at 33 ("[I]t's primarily Anderson's work orders. They find the problems, and they have a work order program/process they go through to get the work done and get it accounted for properly and all that kind of stuff.").) Occasionally, however, Corps personnel will issue work orders to Anderson for things such as plowing wildlife food plots. (Id. at 33-34.) Mr. Hill testified that ninety percent of the items on Anderson's invoices come from work orders that Anderson itself generates. (Hill Dep. at 50.)

Mr. Chitwood testified that he did not believe that the Corps had taken the position that the Corps had no inspection function at the campsites. (Chitwood Dep. at 26.) Specifically, Mr. Chitwood stated:

14

No, I don't think that's our position at all. I think that, you know, we have [a] system in place that we have hired a contractor and delegated that responsibility to the contractor. And if it's not occurring, then we bring it to the contractor's attention.

(Id.)

Irvin Hill, the Corps' construction representative for the Project, testified as follows concerning his duties relating to routine maintenance and repair of the Project's facilities:

I am going to say I don't have anything to do with them. As part of the [Anderson] contract, you know, that's a part of what they do. They manage the day-to-day operations. And if a work order needs to be verified, I will go out and verify that work order.

Say on a weekend the rangers find something. They're going to write it up in a little report. They will send an email. And if it's something construction-related or something that the contractor needs to do, I will go and verify, well, yeah, that is broken. It's an electrical

15

AO 72A
(Rev.8/8
2)

problem. And then I can create a work order and send that to the contractor.

(Hill Dep. at 12-13.) Mr. Hill further testified concerning Anderson:

[P]art of their contract is them managing the operations and maintenance, so they develop their own plan where they go in and do playgrounds twice a year. They do dock inspections every quarter. We do light inspections every six months. And then they do the campground facilities before we close them, figure out what's wrong so while they're closed, they can fix them. And then they come back and inspect them to make sure what they identify gets fixed before we open them back up.

(Id. at 29-30.) Anderson created its own checklist for campground inspections. (Id. at 30.)

16

AO 72A

(Rev.8/8

### d. Duties of Park Rangers and Corps Personnel

Mr. Logan testified that park rangers who notice problems at campgrounds typically call the receptionist, who is an Anderson employee. (Logan Dep. at 11.) The receptionist, in turn, relays the reported problems to Anderson. (Id.) According to Mr. Logan, the Corps generally finds out about the problems "through our contractor meetings when they advise us that they have corrected the problem." (Id.) Mr. Logan testified that he typically drives through the campgrounds on a weekly basis, and that those drives involve "just being abreast of the operations, talking to the park attendant, maintaining a good relationship with them, [and] observing how full the campground is." (Id. at 12.)

17

AO 72A
(Rev.8/8
2)

According to Mr. Logan, park rangers and Corps personnel "primarily don't do inspections" and instead "leave that up to the contractor." (Logan Dep. at 14.) Park rangers, however, can report problems to Anderson. (<u>Id.</u>) Mr. Logan testified that he expects park rangers to look for problems at the Campground's campsites when driving through the area or when dealing with visitors at campsites, and that he expects the rangers to report problems that they notice at the campsites to Anderson. (<u>Id.</u> at 15, 22.) Mr. Logan explained the role of the park rangers as follows: "They're there primarily to enforce Title 36, assist visitors, things like that. And as a result of that, if they were to come across a problem, they certainly would address it." (<u>Id.</u> at 15-16.) Under Title 36, the park rangers address issues

18

AO 72A
(Rev.8/8
2)

such as "[p]arking violations, destruction of public property, littering, [and] abandoning of private property." (Id. at 21.) According to Mr. Logan, the park rangers do not have a duty to go search for hazards at campsites, although he expects the rangers to do so and to report hazards that they find. (Id. at 22-23.) Mr. Logan testified that Anderson, as the maintenance contractor, is responsible for inspecting the campsites and finding defects. (Id. at 24.)

Mr. Chitwood described park rangers' duties as follows:

> Park Rangers normally do, when we go into a campground or a park, we're normally looking at regulation enforcements. We're looking at what you're doing, is what you're doing safe. Safe, for instance, if your kid is swimming out too far away from the campsite, we might go talk to you as a parent and say, your kid is a little far out. We have drownings out here. . . .

(Chitwood Dep. at 12.) Mr. Chitwood further explained:

19

AO 72A

(Rev.8/8
2)

> [W]e look at parking on the grass. Like I tell a lot
> of people, we don't have arrest powers, but we do
> have regulation enforcement responsibility. And it
> is primarily concern with resource protection and
> public safety; that sort of thing. It's Title 36.

(<u>Id.</u>) According to Mr. Chitwood, the rangers focus on public safety. (<u>Id.</u> at 12-13.) Mr. Chitwood testified, however, that rangers who notice something broken or unsafe during patrols would report it to Anderson, who would repair it. (<u>Id.</u> at 13-14.) Mr. Chitwood noted: "We don't go in, these guys are not out there to inspect the park. They are out there to make sure that the use of the park is compliant with ou[r] regulations. . . ." (<u>Id.</u> at 14.)

Mr. Chitwood further testified:

> The Park Ranger's focus is primarily on
> occupied campsites. When he or she [is] doing
> that kind of work, I would expect them to look at
> cursory at [sic] the park. But, you know, their

primary focus at that time is on the use of the park. Our contractor does a thorough inspection of these parks periodically every year, at the beginning of the, prior to the opening season and I think at least once a year. And they know things that are, it's a detailed inspection. If they find something wrong at the campsite, they are going to write it down and make a list for repairs and that sort of stuff. We kind of rely on them for that.

(Chitwood Dep. at 19.) Mr. Chitwood noted that the Corps did not instruct park rangers to inspect campsites, but explained: "If they see something that is messed up, I would want them to go and report it." (Id. at 27; see also id. at 41 ("[I]f [park rangers] see issues that they think need to be resolved, they certainly need to report them.").)

Mr. Chitwood explained that park rangers may not necessarily be in the Campground on a daily basis. (Chitwood Dep. at 35.) According to Mr. Chitwood:

21

AO 72A
(Rev.8/8
2)

> [S]ometimes during the week, we may not go in the [C]ampground. . . . We are in there when the visitation is high. That's when we work the weekends and do the patrol. We're not necessarily in there everyday. We've got a Park Attendant that is, you know . . . .

(<u>Id.</u>)

David Barr, who is the supervisory park ranger over the recreation program at the Project, testified that he develops schedules for the campgrounds, including the Campground, by areas or zones, and that rangers patrol through the Campground on a regular basis. (Dep. of David Barr (Docket Entry No. 23) at 4,7-9.) Mr. Barr described the park rangers' duties as follows:

> [O]n the weekends when we're doing visitor assistance, we're throughout, you know, looking, making sure our campers are in compliance of our rules and regulations, handling parking and so forth, maybe assist the park attendant. You know,

AO 72A

(Rev.8/8

if there is a problem with a camper noise complaint or so forth, we will go deal with that. But just basically ride through the park and just make sure everyone is behaving properly, and everything is safe.

(Id. at 10-11.) Mr. Barr further testified:

When they're on patrol, you know, they're looking for anything that might be a hazard, like a tree limb where it might be hanging from a tree, or maybe there's some debris in the roadway or what not. Some of our biggest concerns, or course, are campfires that might be too big, or they're not in a designated area. You know, we might have a forest fire. So, you know, things of that nature.

But they pretty much just look for that when they ride through the parks, look for other violations. In our swim areas we're always trying to keep an eye on our swimmers, make sure they try to stay within the swim areas; and, you know, if they get too far out in the water, if they have trouble, we may have to summon for help.

(Id. at 11-12.) Mr. Barr further explained:

23

AO 72A

(Rev.8/8

> You know, we're moving in a vehicle, so it's not like we can stare at anything too long, but, you know, we're looking for simple violations and so forth or, like I say, maybe a tree limb hanging out. We're surrounded by trees. That's always our biggest hazard right now with a campground full of people, so we are always looking for those. Any violations the campers may have, kids riding bikes in the road, you know, we may have to address that, just a variety of things. But, you know, when you're riding through a park, you may have three seconds to look at a site.

(Id. at 13.) Mr. Barr testified that park rangers conduct patrols for "[t]wo reasons: for visitor safety and also for compliance of our rules and regulations in Title 36." (Id. at 28.)

Mr. Barr later explained that park rangers do not generally go onto the campsites and look for problems with steps, noting:

24

> [I]f we're on the campsite, you know, addressing an issue with a camper, you know, we might be there. And if we were to see something, of course, we would report it as a safety item. But as a general rule of thumb we're not out looking at those steps. . . .

(Barr Dep. at 21.) According to Mr. Barr, the contract with Anderson does not exclude the rangers from the campsites, and if he found a defect in the stairs at a campsite, he would report it to the receptionist, who is an Anderson employee. (Id. at 22.)

Mr. Barr further testified that campers may inform the park attendant of maintenance problems at campsites. (Barr Dep. at 16.) Mr. Barr stated: "Our protocol is for the park attendant to call in the maintenance item to the contractor, which is our front desk here, to the receptionist. And they go ahead and notify the on-call Anderson person

25

AO 72A
(Rev.8/8

to send someone out to repair it." (Id.) According to Mr. Barr, if Anderson fails to make the repair, "the park attendant will bring it up to a park ranger." (Id.) Mr. Barr explained: "Usually we go through our contract representative, . . . and let him know, you know, this has been a repeat problem and needs to be addressed; and he will usually talk to the contractor about that." (Id. at 17.) Mr. Barr further noted:

> [L]ike on routine patrol on the weekends, if [park rangers] find anything that's, you know, maybe broken or so forth, we combine that after the weekend on a list. We provide that to Anderson or to Irvin [Hill] for him to forward to the contractor for repairs.

(Id. at 32.)

Mr. Hill testified that he drives through the Campgrounds on Mondays and that he may get out of his

26

vehicle, walk around, and inspect the campgrounds. (Hill Dep. at 17, 19-20.) Mr. Hill acknowledged that he looks for defects or broken structures. (Id. at 17.) Mr. Hill further stated that if he found a problem that needed a repair, he would prepare a work order and give it to Anderson. (Id.) Mr. Hill explained that he does not "necessarily actually get out and inspect each and every campground site," noting that he looks for possible dangers to visitors and Anderson personnel. (Id. at 18-19.) Mr. Hill indicated that he may look at stairs or steps at a campsite to make sure that the steps or stairs are in good repair. (Id. at 21.)

Mr. Hill also noted that park rangers who notice needed repairs at campsites will report the problems to him or to their supervisor. (Hill Dep. at 46.) Mr. Hill then verifies the

AO 72A
(Rev.8/8
2)

problem and issues a work order to Anderson. (Id.) Mr. Hill

testified that the Corps expect park rangers and Anderson

personnel to report problems that they see. (Id. at 47.)

### e. Responsibility for Managing Anderson's Work

Mr. Chitwood testified that Anderson is responsible for

managing its work, noting:

> [W]e pay the contractor to manage their work.
> There is a whole technical provision in this
> contract that has to do with management. And
> that is not to be ignored, because it is pretty
> expensive, to be honest with you, to pay for that.

(Chitwood Dep. at 19.) According to Mr. Chitwood,

Anderson submits reports to the Corps, and the Corps

reviews those reports. (Id. at 20.) Mr. Chitwood explained

that if Anderson does not repair things, the park attendants

will notify the Corps, who will "bring it to the contractor's

28

attention more formally." (Id. at 25.) At that point, the Corps "would make sure that" Anderson was aware of the situation. (Id. at 25-26.) Mr. Chitwood explained: "[W]e pay [Anderson] to implement a quality control program, to oversee that program and to make these, to maintain these parks in the way that they are supposed to be maintained. That's a big part of this contract is the management of that work." (Id. at 26-27.) Mr. Chitwood, however, testified, "[W]e administer their contracting and we evaluate their performance." (Id. at 41.)

Mr. Hill testified that Anderson developed a quality control plan governing its work. (Hill Dep. at 22, 38.) Anderson issues quality control reports, which Mr. Hill reviews only if Anderson has "a problem on a site or a

problem with any TP." (Id. at 23.) According to Mr. Hill, that occurred approximately three times during his five-year tenure as construction representative. (Id. at 24.)

Corps representatives hold weekly meetings with Anderson. (Barr Dep. at 18; Logan Dep. at 24.) During those meetings, Anderson advises the Corps representatives what it has been doing and what it has accomplished. (Logan Dep. at 24.) Mr. Barr stated:

> Generally, the superintendent of Anderson, Phil Johnson, creates an agenda for the meeting. And it consists of three things, basically: what they have done over the past week, what their schedule is for the coming week, and their grass mowing schedule.

(Barr Dep. at 18-19; see also id. at 30 (stating that Anderson creates agenda for meeting).) During the meetings, Anderson informs the Corps representatives "how

things are going with their maintenance." (Id. at 19.) According to Mr. Barr, during the meetings, the Corps representatives "just kind of communicate and listen to what they're doing." (Id. at 20.)

Mr. Barr noted that Corps representatives could recommend to Anderson that it re-prioritize its work at the Campground. (Barr Dep. at 25-26, 28.) According to Mr. Barr, Anderson generally re-prioritizes its work upon request by Corps representatives unless it lacks resources to complete certain work at a given time. (Id. at 25-26.) Mr. Barr testified that the Corps did not re-prioritize Anderson's list of tasks for the coming week very often, noting "[i]t's probably maybe 10 percent, if that." (Id. at 30.)

Mr. Hill stated:

31

> [W]e don't really tell them exactly what to do. We just tell them, hey, this is a priority. We had a windstorm to come. Go through this particular park and make sure you down all the dead trees. We kind of just give them a priority of work.

(Hill Dep. at 28.) Mr. Hill noted that "whenever there is a conflict, we kind of step in and give them the priority." (Id. at 29.) Mr. Hill, however, testified that conflicts in priority, on average, occurred approximately six times per year. (Id. at 50.)

Mr. Chitwood explained that in certain situations, Anderson may alert the Corps if repairs or replacements are necessary, noting:

> They may not come to us every time and say, this needs to be fixed. We don't expect them to do that. We meet with them on a weekly basis. Things that are of significant cost or maybe significant public impact, we would definitely discuss with them. If it's a minor thing, you know,

32

we're not going to sit there and talk about every
little minor thing that needs to be done. It just
wouldn't be productive.

(Chitwood Dep. at 44.) Mr. Chitwood also testified concerning Anderson:

I have input into their performance evaluations. I
attend the meetings that we have weekly and
certainly would have input in those discussions as
well. I would go out and look at work that they are
doing specified renovation type of work; that kind
of thing. It's not a big part of my job, but I do have
input.

(Id. at 50.) According to Mr. Chitwood and Mr. Hill, the

Corps evaluates Anderson monthly and conducts formal

scoring evaluations of Anderson quarterly. (Id.; Hill Dep. at

25.)

Mr. Hill testified that he is responsible for ensuring that

Anderson performs efficiently and effectively, stating:

33

AO 72A

(Rev.8/8
2)

Well, I do random inspections of all of the TPs. They have got technical provisions: cutting the grass, raking beaches, cleaning the facilities, navigational maintenance. There's a lot of TPs.

And I verify because they wrote in the contract, or they wrote in their proposal, hey, this is how we're going to keep your grass cut. So I do a random inspection and say, okay, you guys are cutting grass in this particular park today. I will go into that particular park and just see how they are cutting the grass. Are they meeting the standard that they stated they would in their proposal?

(Hill Dep. at 14.) Mr. Hill testified that his schedule for inspections is random, noting that, on Mondays: "I hit all of the campgrounds to find out what happened over the weekend. Is there anything that broke that didn't get reported?" (Id. at 15.) Mr. Hill further testified:

[I]f I see something that needs to be repaired, you know, I write it up when I come back as a work order. We generate work orders for Anderson just on stuff that we find. Anderson comes into the

34

park. The cleaning staff is in the park. The park attendants are in the park. And then the general public. And they will report stuff. And once they report it, Anderson will generate their own work order. But like if I catch it first, I come in, and I can generate a work order to say, hey, we've got a problem here. I need you guys to go and fix it.

(Id. at 16.)

### 4. Job Descriptions

The Natural Resource Manager position description provides, in relevant part:

[s]erves as Assistant Operations Project Manager for a large geographical area, which includes a major public lake and surrounding public lands. The incumbent shares responsibility for planning, scheduling, coordinating, and directing the execution of complex and complicated natural resource and recreation programs that are subject to numerous problems. The incumbent shares responsibility for overall management and maintenance of park and recreation areas. The incumbent has full authority to act in the absence of the Operations Project Manager.

35

(Pl.'s Dep. Ex. 5 (Docket Entry No. 27-5) at 2.) The position description also states:

> Incumbent is responsible for coordination of the plans for the management, operation and maintenance of the natural resources, parks, recreation sites and facilities. Periodically inspects all activities, observing working conditions, methods, procedures, rate of progress, and conditions of plant and equipment. Issue orders and directions based on observations to increase efficiency, economy, and safety. Supervises the inspection of physical facilities within area of responsibility. The natural resource manager provides for visitor safety and protection through the inspection of facilities to ensure they are free from hazards.

(Id. at 3.) Finally, the position description states:

> Serves as Contracting Officer's Representative overseeing the projects operation and maintenance and law enforcement contract(s) with local county sheriff's department. Contracts provide a wide range of services including mowing, fee collection, surveillance, refuse collection, facilities O&M, janitorial, vegetation

36

management, fire protection, etc. Mediates contract disputes with contractors and subordinate Contracting Officer's Representative and alternate Contracting Officer's Representative and serves as chief liaison between contractor and Contracting Officer. Provides recommendations for award and non-award to the Contracting Officer. Ensures an effective internal quality control program is established by each contractor to reduce deficiency notices, improve quality of contract performance and to ensure the safety of contract personnel.

(Id. at 5.)

Mr. Chitwood testified that the job description for his Natural Resource Manager position is a generic one and is not specific to his situation. (Chitwood Dep. at 28-29.) Mr. Chitwood, however, acknowledged that the Corps assigned him to that position description. (Id. at 30.) According to Mr. Chitwood, he is "responsible for ensuring that the place

AO 72A
(Rev.8/8
2)

is safe for the visitors to use." (Id. at 56.) Mr. Chitwood, however, testified:

> I'm not expected to go out there and do the inspections themselves. To me, I'm just suppose[d] to make sure that the areas are being checked either by the contract or whomever to make sure that they are safe.

(Id.) Mr. Chitwood acknowledged that public safety is one of his job responsibilities. (Id. at 57.)

The position description for the Supervising Park Ranger position provides, in relevant part: "[O]n supervision of contractual activities, is responsible for inspecting work areas, making safety recommendations and corrective actions taken on daily reports." (Pl.'s Dep. Ex. 7 (Docket Entry No. 27-7) at 3.) The Supervising Park Ranger position description also states:

38

AO 72A

(Rev.8/8
2)

> Develops specifications, technical requirements, and estimates for various work activities of the project. Directs pre- and post-award conferences. Assures contractor understands all contractual requirements. Directs and monitors the execution of contracts. Implements quality assurance and initiates change orders. Meets with contractors and technical personnel and resolves questions involving plans and specifications, material, and workmanship. Processes contractor invoices for payment.

(Id.)

The position description for the Construction Control Eepresentative provides, in relevant part:

> Functions as lead staffer for the Operations Manager (who also is the Authorized Representative of the Contracting Officer (ARCO)[,] providing broad based contract administration support. Responsible for daily liaison with the contractor(s) (personal contacts are to resolve mutual problems, to coordinate work with pers[o]nnel of related activities, to advise on discrepancies found in meeting terms to consider recommendations and to promote adherence to

39

regulations)[.] The Operations Manager is kept informed of pertinent developments, conclusions and commitments. Develops and executes the Government[']s Quality Assurance (QA) program including conducting Mutual Understanding Meetings. Performs payroll, inventory, invoice and other audits (as may be necessary and Negotiates field modifications and similar agreements when precedents are well established and the contractors['] and Government[']s bargaining positions are close. Interprets contract(s) requirements and clarifies for the contractor(s) issue of procedure, submittal, compliance, etc. Prepares and conducts portions of pre-proposal and pre-construction conferences. Attends contractor preparatory inspections. Maintains files on all contracts. Determines the Government[']s small purchase requirements for maintenance materials and supplies to be purchased by BPAs and SF-44s.

(Pl.'s Dep. Ex. 9 (Docket Entry No. 28-1) at 2-3.)

## II. Procedural Background

On September 19, 2012, Plaintiff filed this lawsuit.

(Docket Entry No. 1.) On December 7, 2012, the

40

Government filed its Motion to Dismiss. (Docket Entry No. 6.) The Court permitted the Parties to take jurisdictional discovery in connection with the Motion to Dismiss. (Order of Feb. 4, 2013 (Docket Entry No. 13); Order of May 9, 2013 (Docket Entry No. 18).) The Parties filed supplemental briefs after the jurisdictional discovery period expired. (Docket Entry Nos. 29-30.) The Court finds that the Motion to Dismiss is ripe for resolution.

## III. Discussion

### A. Applicable Standard of Review

The Government moved to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(1), arguing that the Court lacks subject matter jurisdiction over this case. "A motion to dismiss for lack of subject matter jurisdiction

AO 72A
(Rev.8/8
2)

under [Federal Rule of Civil Procedure] 12(b)(1) can be made in one of two ways: a facial attack or a factual attack." Taylor v. Gazolio, Inc., No. 12-61151-Civ., 2012 WL 3683517, at *1 (S.D. Fla. Aug. 24, 2012). "'Facial attacks' on the complaint 'require[] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [the] complaint are taken as true for the purposes of the motion.'" Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (first and second alterations in original) (quoting Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980)[1]).

---

[1]The United States Court of Appeals for the Eleventh Circuit has adopted as binding all precedent from the United States Court of Appeals for the Fifth Circuit issued before September 30, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/8
2)

"'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" Id. (quoting Menchaca, 613 F.2d at 511). The Eleventh Circuit has observed:

> These two forms of attack differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a [Federal] Rule [of Civil Procedure] 12(b)(6) motion–the court must consider the allegations of the complaint to be true. Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897, 102 S. Ct. 396, 70 L.Ed.2d 212 (1981). But when the attack is factual,
>
> > the trial court may proceed as it never could under 12(b)(6) or [Federal Rule of Civil Procedure] 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction–its very power to hear the case–there is substantial authority

43

AO 72A
(Rev.8/8
2)

that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Id. at 412-13 (quoting Mortenson[ v. First Fed. Sav. & Loan Ass'n], 549 F.2d [884, 891 (3d Cir. 1977)].

Id. The Eleventh Circuit, however, has cautioned that "[w]hen the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a [Federal] Rule [of Civil Procedure] 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." Id. at 1530. Under those circumstances, "federal claims should not be dismissed on

44

motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact." Id. at 1531.

## B. Discussion

Here, the Government argues that the Court lacks subject matter jurisdiction over Plaintiff's claim because the Corps entered into a contract with Anderson to manage the Project. According to the Government, the FTCA expressly excludes independent contractors from its coverage.

"It is well settled that sovereign immunity bars suit against the United States except to the extent that it consents to be sued." Means v. United States, 176 F.3d 1376, 1378 (11th Cir. 1999). "It is equally settled that

statutory waivers of sovereign immunity 'are to be construed strictly in favor of the sovereign.'" Id. (quoting McMahon v. United States, 342 U.S. 25, 27 (1951)).

The FTCA provides a limited waiver of sovereign immunity for actions against the federal government involving

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "Suits under the FTCA are limited to those which involve claims arising from 'the negligent or wrongful act or omission of any employee of the Government . . . acting within the scope of his office or

46

employment.'" Tisdale v. United States, 62 F.3d 1367, 1371 (11th Cir. 1995) (quoting 28 U.S.C. § 1346(b)). "The FTCA specifically excludes 'any contractor with the United States' from its coverage." Id. (quoting 28 U.S.C. § 2671). "Thus, the United States is not liable for the acts or omissions of the independent contractors that it employs." Id.

The Court uses a "control" test to determine whether an individual is an employee of the Government for purposes of the FTCA. Patterson & Wilder Constr. Co. v. United States, 226 F.3d 1269, 1274 (11th Cir. 2000). "Under this test, a person is an employee of the Government if the Government controls and supervises the day-to-day activities of the alleged tortfeasor during the relevant time." Id. "Notably, it is not necessary that the Government

47

continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of the task." Id.

Here, the Government argues that the Corps entered into a management contract for the Project with Anderson, that Anderson was responsible for maintaining the Campground, and that the Corps ceded responsibility for inspecting, maintaining, and repairing the Campground to Anderson. If that were indeed the case, the United States would not be liable under the FTCA for Plaintiff's injury, and the Court would lack jurisdiction over Plaintiff's claims relating to negligent or wrongful acts or omissions that the management company may have committed.

AO 72A
(Rev.8/8
2)

The Court, however, agrees with Plaintiff that this issue is intertwined with the merits of Plaintiff's claims. See Broughton v. United States, No. CV408-248, 2010 WL 3731162, at *1 (S.D. Ga. Sept. 7, 2010) (finding that outcome of jurisdictional issue in FTCA case depended on whether employees of third-party contractor were considered to be Government employees and noting "the existence of jurisdiction is 'inextricably intertwined' with the merits of Plaintiff's underlying lawsuit because deciding the jurisdictional issue necessarily impacts an element of Plaintiff's claim"). As such, the Court cannot resolve the issue on a Rule 12(b)(1) Motion to Dismiss.[2] See Eaton v.

---

[2]Moreover, as Plaintiff points out, the Government might be liable to Plaintiff under a premises liability theory even if the Corps contracted with Anderson to manage and maintain the Campground. See Tisdale, 62 F.3d at 1371-72 (concluding that

AO 72A
(Rev.8/8
2)

United States, as landowner, might be liable to plaintiffs under Georgia statute governing premises liability). Specifically, O.C.G.A. § 51-3-1 provides: "Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." O.C.G.A. § 51-1-3. Consequently, the Government, as the landowner, could be liable to Plaintiff under O.C.G.A. § 51-3-1 if the Campground was in an unsafe condition.

In Tisdale, however, the court observed that, under Georgia law, "a landowner may relinquish possession and control of his property to an independent contractor and thereby be relieved of his duties to those who enter his property." 62 F.3d at 1372. "Upon the landowner's delivery of possession and control of the property to an independent contractor, '[t]he contractor then becomes the occupier of the land within the meaning of the Georgia statute.'" Id. (alteration in original) (quoting Hodge v. United States, 310 F. Supp. 1090, 1098 (M.D. Ga. Feb. 20, 1969), aff'd, 424 F.2d 545 (5th Cir. 1970) (internal quotation marks omitted)). "As the 'occupier' of the land within the meaning of O.C.G.A. § 51-3-1, the independent contractor thereby becomes potentially liable, in the landowner's stead, to invitees for damages caused by the unsafe condition of the premises." Id.

Whether the Corps turned over possession and control of the Campground to Anderson also is intertwined with the merits of Plaintiff's claims. The evidence in the record also conflicts on this point, indicating that the Corps may not have turned over possession and control of the Campground on a day-to-day basis to Anderson. (Logan Dep. at 16, 20-21, 23; Chitwood Dep. at 40-

AO 72A

(Rev.8/8
ว\

<u>Dorchester Dev., Inc.</u>, 692 F.2d 727, 733 (11th Cir. 1982)

("Where the jurisdictional issues are intertwined with the substantive merits, 'the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other.'" (quoting <u>Chatham Condo. Ass'ns v. Century Vill., Inc.</u>, 597 F.2d 1002, 1011 (5th Cir. 1979))).

Further, in light of the record evidence, the Court concludes that a genuine dispute remains as to whether the Corps retained some responsibility on a day-to-day basis to

---

41.) Under those circumstances, the Court finds that a genuine dispute remains as to whether the Corps is liable to Plaintiff under a premises liability theory.

In its reply, the Government argues that Plaintiff failed to exhaust his administrative remedies with respect to a premises liability claim. (Gov't Reply Supp. Mot. Dismiss (Docket Entry No. 11) at 3.) The record at this stage of the proceedings, however, does not permit the Court to determine that Plaintiff failed to exhaust his administrative remedies as to his premises liability claim. The Court therefore cannot dismiss the case for lack of jurisdiction based on this argument.

51

inspect the Campground, or to manage, direct, or control Anderson's performance under the Contract. Specifically, the evidence, viewed in the light most favorable to Plaintiff, indicates that: (1) Corps personnel routinely conduct at least some inspections; (2) the Corps expects its rangers to look for and report maintenance and problems, even though doing so is not the rangers' primary duty; (3) Corps personnel routinely review and evaluate Anderson's work; (4) Corps personnel regularly inspect Anderson's work; and (5) Corps personnel have the power to direct Anderson to re-prioritize its work, and, on occasion, have used that power. (Logan Dep. at 12-16, 21-24, 33-34; Chitwood Dep. at 26-27, 41, 50; Barr Dep. at 7-13, 18, 25-26, 28, 30; Hill Dep. at 14-19, 21, 25, 28-29, 46-47, 50.) Under those

circumstances, a genuine dispute exists as to whether the Corps has turned over the responsibility to manage and maintain the Project on a day-to-day basis to Anderson. The Court cannot resolve that dispute in favor of the Government at this stage of the proceedings.

For the reasons discussed above, the Court cannot find that it lacks jurisdiction over Plaintiff's FTCA claims. The Court consequently denies the Government's Motion to Dismiss.[3]

---

[3]In his supplemental brief, Plaintiff notes that he requested that the Government withdraw its Motion to Dismiss under Federal Rule of Civil Procedure 11. (Pl.'s Supp. Br. (Docket Entry No. 29) at 6 n.3.) The Court notes that the issue of jurisdiction is a relatively close one. Under those circumstances, the Government's Motion to Dismiss certainly was not frivolous.

AO 72A
(Rev.8/8
2)

## IV. Conclusion

ACCORDINGLY, the Court **DENIES** the Government's

Motion to Dismiss [6].

IT IS SO ORDERED, this the 18 day of July, 2013.

_____
UNITED STATES DISTRICT JUDGE

AO 72A

(Rev.8/8
2)