IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

LEE ROY SWAFFORD,

     Plaintiff,

v.

                        CIVIL ACTION FILE NO.:
                        4:12-CV-0220-HLM

UNITED STATES OF AMERICA,

     Defendant.

ORDER

This is an action filed against the United States of
America (the "Government") under the Federal Tort Claims
Act (the "FTCA"). The case is before the Court on the
Government's Motion for Summary Judgment [78].

## I. Background

Keeping in mind that when deciding a motion for
summary judgment, the Court must view the evidence and

all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual findings of fact. In re Celotex Corp., 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

2

## A. Factual Background

### 1. The Parties

Plaintiff resides in Floyd County, Georgia. (Amd. Compl. (Docket Entry No. 48) ¶ 4; Dep. of Pl. (Docket Entry No. 79) at 6.) The United States Army Corps of Engineers (the "Corps") is an agency of Defendant United States of America. (Amd. Compl. ¶ 2; Answer Amd. Compl. ¶ 2.) The Army Corps of Engineers owns the R. Shaefer Heard Campground, (the "Campground") located near West Point, Georgia. (Def. Statement of Material Facts ("DSMF") (Docket Entry No. 78-2) ¶ 2; Pl.'s Resp. Def. Statement of Material Facts ("PRDSMF") (Docket Entry No. 84) ¶ 2.)

3

## 2. The Fee and Plaintiff's Arrival at the Campground

Plaintiff and his wife traveled to West Point, Georgia to camp at the Campground in September 2010. (DSMF ¶ 1; PRDSMF ¶ 1.) Plaintiff made a reservation online and paid a rental fee of twenty-two dollars a day for six days, totaling $132.00. (DSMF ¶ 3; ¶ PRDSMF ¶ 3.) The Campground is one of the specialized areas in the Corp's West Point Lake Project (the "Project"), and Plaintiff was charged a fee to utilize the Campground and recreational vehicle pads. (DSMF ¶ 6; PRDSMF ¶ 6.) "The campground provided water and power for each camper and sanitation services for use of private restroom provisions in each camper." (DSMF ¶ 7; PRDSMF ¶ 7.)

AO 72A
(Rev.8/8
2)

In order to use the campground and stay overnight, campers had to pay a fee. (Dep. of Larry Chuck (Docket Entry No. 85-3) at 11; Mar. 7, 2014 Dep. of David Barr (Docket Entry No. 78-17) at 26.) When the Corps collects a fee for an "additional and specialized" recreation area, its purpose is not to profit but to "enhanc[e] the quality of the visitor experience, protection of resources, repair and maintenance, interpretation, signage, habitat or facility enhancement, resource preservation…and law enforcement." (DSMF ¶ 4 (alteration and omission in original) (quoting Decl. of Stephen Logan (Docket Entry No. 78-8) (internal quotation marks omitted)) ¶ 5); PRDSMF ¶ 4.) Engineer Regulation 1130-2-550 § 9-2 and Engineering Pamphlet 1130-2-550 state that the goal of the recreation

AO 72A
(Rev.8/8
2)

use fee is to "recover a portion fo the cost of administering, operating, maintaining, and improving" facilities on the Campground." (DSMF ¶ 5 (quoting Logan Decl. ¶ 5); PRDSMF ¶ 5.) The Corps collects the fee to help defray the costs of the provision of utilities. (DSMF ¶ 8; PRDSMF ¶ 8.)

The amount of the fee "was not based on the number of people residing or visiting the camper." (DSMF ¶ 9; PRDSMF ¶ 9.) Instead, the amount of the fee depended on the size of the amp for electrical service. (Dep. of John Estes (Docket Entry No. 85-2) at 34-35; Chuck Dep. at 11.) Visitors visiting people camping at the Campground are allowed to come in but must pay a user fee for a visitor

6

AO 72A
(Rev.8/8
2)

pass. (Estes Dep. at 24-25; R. Shaefer Heard Campground Pamplet (Docket Entry No. 27-3) at 2.)

Occupants of the camper and day visitors to the Project could freely use other "recreational activities such as swimming, boating, hiking, sightseeing, picnicking, pleasure driving and nature study provided at the [P]roject." (DSMF ¶ 9; PRDSMF ¶ 9.)

Plaintiff and his wife arrived at the Campground on September 18, 2010. (DSMF ¶ 10; PRDSMF ¶ 10.) While there, they went boating, fishing, and biking. (Id.; id.)

### 3. The Events of September 21, 2010

On the morning of September 21, 2010, Plaintiff got up before daybreak and, once it was light outside, took his dog for a walk. (DSMF ¶ 11; PRDSMF ¶ 11.) Plaintiff, with his

7

dog on a leash, walked from his campsite to campsite 26 because Plaintiff wanted to view the lake from that campsite. (DSMF ¶ 12; PRDSMF ¶ 12.) "Plaintiff started down the steps to campsite 26 holding the dog's leash and a cup of coffee." (DSMF ¶ 13; PRDSMF 13.) The steps had a handrail on the right side. (DSMF ¶ 14; PRDSMF ¶ 14.) Plaintiff walked down the left side of the steps and did not hold onto the handrail. (Id.; id.) On his way down the steps, Plaintiff fell to the left. (DSMF ¶ 15; PRDSMF ¶ 15.)

### 4. Management of the Campground

Since December 1, 2005, the Corps has contracted with Anderson Construction Company ("Anderson") for all maintenance and repair for the Project. (DSMF ¶ 16; PRDSMF ¶ 16.) The contract with Anderson "covers the

8

AO 72A

(Rev.8/8
2)

'complete inspection, maintenance, and repair of all project buildings and structures' including (1) 'campsites, picnic sites...steps [and] walkways' such that is 'necessary to keep them in safe working condition' and (2) 'repairing or replacing...steps' on 'nature and hiking trails.'" (DSMF ¶ 17 (citation omitted) (quoting Anderson Contract (the "Contract") (Docket Entry No. 78-9) at C-8, C-14); PRDSMF ¶ 17.)

Anderson employees are on the general Campground area daily and when they notice a deficiency they report it. (DSMF ¶ 18 as modified per PRDSMF ¶ 18; PRDSMF ¶ 18.) Twice a year, when the park closes and before it reopens, Anderson performs a formal campground inspection of each of the campgrounds, and they note

9

deficiencies at each campsite along with what needs to be repaired or improved, but Anderson did not document that the steps at Campsite 26 because the inspection logs only show what needed to be repaired. (DSMF ¶ 19 as modified per PRDSMF ¶ 19; PRDSMF ¶ 19.) When conducting its annual inspections, Anderson does not use an inspection checklist where its representative could check off items inspected at each campsite. (DSMF ¶ 21; PRDSMF ¶ 21.) The inspection reports did, however, show that other steps on campsites were at least sometimes inspected. (Mar. 25, 2014 Chitwood Dep. at 40; Campground Inspection (Docket Entry No. 78-16) at 2, 3.)

10

## 5.    The Anderson Contract

The stated purpose of the Anderson Contract is "[t]o provide for the maitenance, repair, and operations, of facilities, vehicles, and equipment on West Point Project. (Anderson Contract at 2.) The Anderson Contract provides, in relevant part:

> The contractor shall provide all planning, programming, administration, management, supervision, maintenance of accurate and complete records and files, quality control inspection, personnel, materials, supplies, parts, tools, equipment and vehicles, except as otherwise provided for herein, necessary to operate and maintain Government-owned facilities and equipment at the [Project].  Work under this contract shall be performed under the general direction of the Authorized Representative of the Contracting Officer (ARCO).  The contractor shall assure that all services are conducted in accordance with the contract and all applicable laws, regulations, codes, or directives. Performance shall be in accordance with all

11

> Terms, Conditions, General, Specific and
> Technical Provisions [("TPs")], Drawings,
> Attachments, Exhibits, etc. contained herein or
> incorporated by reference. Incorporation by
> reference shall include any and all mandatory
> provisions required by the Federal Acquisition
> Regulation (FAR), whether it is referenced or not,
> current at the time of contract award.

(<u>Id.</u> at 3.) With respect to technical provisions, the Contract

describes the scope of work as:

> [t]he complete inspection, maintenance, and repair
> of all project buildings and structures, including
> mechanical, electrical, water, plumbing, water
> treatment, distribution, and sewage disposal
> systems. Services necessary to keep these
> facilities in a safe, neat, attractive and well
> maintained condition include lubrication,
> refastening, refitting, replacing and repairing roofs,
> walls, ceilings, floors, ceramic tile, windows, sky
> lights, vents, doors, trim, paint, partitions, building
> hardware and fixtures.

(<u>Id.</u> at 9.) With respect to other facilities, the Contract

states:

Maintenance and repair shall include, but is not limited to, sanitary disposal stations, playgrounds, play apparatus, game court equipment, bulletin boards, campsites, picnic sites, bulkheads, steps, walkways, pedestrian bridges, fishing decks, curbs, tables, grills, trail markers, etc. Maintenance, repair or replacement of project structures is necessary to keep them in safe working condition.

(Id.)

The Contract further provides that "[t]he contract shall perform in accordance with the latest edition of the following individual standards and codes, manuals, and other documents." (Anderson Contract at 3.) "The Government will furnish vehicles and equipment for use in accomplishing contract requirements." (Id. at 4.) The contractor, however, may procure equipment "under his normal procurement procedures." (Id.) The Contract also directs the contractor to "prepare weekly schedules detailing planned activities,"

13

which "shall be submitted to the ARCO the week prior to commencement of activity." (Id. at 7.)  The contractor is also required to furnish Operation Plans including a Quality Control Plan. (Id. at 8.)

### 6. The Corps's Management of Anderson

Defendant states that the Corps has "general direction" over Anderson's performance of its contract duties but that "Anderson controls the work and how it is done and when it gets done." (DSMF ¶ 22.)  Robert Chitwood, the Assistant Operations Manager at the Project, testified that Anderson is responsible for managing its work, noting:

> [W]e pay the contractor to manage their work. There is a whole technical provision in this contract that has to do with management.  And that is not to be ignored, because it is pretty expensive, to be honest with you, to pay for that.

14

(June 20, 2013, Dep. of Robert Chitwood (Docket Entry No. 78-15) at 19.) According to Mr. Chitwood, Anderson submits reports to the Corps, and the Corps reviews those reports. (Id. at 20.) Mr. Chitwood explained that if Anderson does not repair things, the park attendants will notify the Corps, who will "bring it to the contractor's attention more formally." (Id. at 25.) At that point, the Corps "would make sure that" Anderson was aware of the situation. (Id. at 25-26.) Mr. Chitwood explained: "[W]e pay [Anderson] to implement a quality control program, to oversee that program and to make these, to maintain these parks in the way that they are supposed to be maintained. That's a big part of this contract is the management of that work." (Id. at 26-27.) Mr. Chitwood, however, testified,

15

"[W]e administer their contracting and we evaluate their performance." (Id. at 41.)

Mr. Irvin Hill, the Project's Construction Control Representative, testified that Anderson developed a quality control plan governing its work. (Dep. of Irvin Hill (Docket Entry No. 78-14) at 22, 38.) Anderson issues quality control reports, which Mr. Hill reviews only if Anderson has "a problem on a site or a problem with any [technical provision]." (Id. at 23.) According to Mr. Hill, that occurred approximately three times during his five-year tenure as construction representative. (Id. at 24.)

Corps representatives hold weekly meetings with Anderson. (June 21, 2013, Dep. of David Barr (Docket Entry No. 78-5) at 18; June 21, 2013, Dep. of Steven Logan

16

(Docket Entry No. 78-6) at 24.) During those meetings, Anderson advises the Corps representatives what it has been doing and what it has accomplished. (June 21, 2013, Logan Dep. at 24.) Mr. Barr stated:

> Generally, the superintendent of Anderson, Phil Johnson, creates an agenda for the meeting. And it consists of three things, basically: what they have done over the past week, what their schedule is for the coming week, and their grass mowing schedule.

(June 21, 2013, Barr Dep. at 18-19; see also id. at 30 (stating that Anderson creates agenda for meeting).) During the meetings, Anderson informs the Corps representatives "how things are going with their maintenance." (Id. at 19.) According to Mr. Barr, during the meetings, the Corps representatives "just kind of communicate and listen to what they're doing." (Id. at 20.)

17

AO 72A
(Rev.8/8
2)

Mr. Barr noted that Corps representatives could recommend to Anderson that it re-prioritize its work at the Campground. (June 21, 2013, Barr Dep. at 25-26, 28.) According to Mr. Barr, Anderson generally re-prioritizes its work upon request by Corps representatives unless it lacks resources to complete certain work at a given time. (Id. at 25-26.) Mr. Barr testified that the Corps did not re-prioritize Anderson's list of tasks for the coming week very often, noting "[i]t's probably maybe 10 percent, if that." (Id. at 30.)

Mr. Hill stated:

[W]e don't really tell them exactly what to do. We just tell them, hey, this is a priority. We had a windstorm to come. Go through this particular park and make sure you down all the dead trees. We kind of just give them a priority of work.

AO 72A
(Rev.8/8
2)

(Hill Dep. at 28.) Mr. Hill noted that "whenever there is a conflict, we kind of step in and give them the priority." (Id. at 29.) Mr. Hill, however, testified that conflicts in priority, on average, occurred approximately six times per year. (Id. at 50.)

Mr. Chitwood explained that in certain situations, Anderson may alert the Corps if repairs or replacements are necessary, noting:

> They may not come to us every time and say, this needs to be fixed. We don't expect them to do that. We meet with them on a weekly basis. Things that are of significant cost or maybe significant public impact, we would definitely discuss with them. If it's a minor thing, you know, we're not going to sit there and talk about every little minor thing that needs to be done. It just wouldn't be productive.

19

AO 72A
(Rev.8/8
2)

(June 20, 2013, Chitwood Dep. at 44.)  Mr. Chitwood also testified concerning Anderson:

> I have input into their performance evaluations.  I attend the meetings that we have weekly and certainly would have input in those discussions as well.  I would go out and look at work that they are doing specified renovation type of work; that kind of thing.  It's not a big part of my job, but I do have input.

(Id. at 50.)  According to Mr. Chitwood and Mr. Hill, the Corps evaluates Anderson monthly and conducts formal scoring evaluations of Anderson quarterly.  (Id.; Hill Dep. at 25.)

Mr. Hill testified that he is responsible for ensuring that Anderson performs efficiently and effectively, stating:

> Well, I do random inspections of all of the TPs. They have got technical provisions: cutting the grass, raking beaches, cleaning the facilities, navigational maintenance. There's a lot of TPs.

AO 72A
(Rev.8/8
2)

> And I verify because they wrote in the contract, or they wrote in their proposal, hey, this is how we're going to keep your grass cut. So I do a random inspection and say, okay, you guys are cutting grass in this particular park today. I will go into that particular park and just see how they are cutting the grass. Are they meeting the standard that they stated they would in their proposal?

(Hill Dep. at 14.) Mr. Hill testified that his schedule for inspections is random, noting that, on Mondays: "I hit all of the campgrounds to find out what happened over the weekend. Is there anything that broke that didn't get reported?" (Id. at 15.) Mr. Hill further testified:

> [I]f I see something that needs to be repaired, you know, I write it up when I come back as a work order. We generate work orders for Anderson just on stuff that we find. Anderson comes into the park. The cleaning staff is in the park. The park attendants are in the park. And then the general public. And they will report stuff. And once they report it, Anderson will generate their own work order. But like if I catch it first, I come in, and I can

21

generate a work order to say, hey, we've got a problem here. I need you guys to go and fix it.

(Id. at 16.)

### 7. The Condition of the Steps

Several of Defendant's employees, as well as one of Anderson's, inspected the stairs after Plaintiff's fall and found nothing wrong. David Barr, the Supervisory Park Ranger at the Project, testified at his deposition that he sent another park ranger, Randy Dye, to inspect the site and Mr. Dye reported that "he didn't see anything out of the ordinary down there." (Mar. 7, 2014, Barr Dep. at 13.) Mr. Barr said he then went to double-check and "did not see anything." (Id. at 16.) In fact, he testified that he found everything to be "pretty firm and pretty level." (Id. at 20-21.) Mr. Barr also had Anderson, the contractor, inspect the stairs, and says

22

he was told that "they did not see anything defective." (Id. at 16.) Mr. Barr further testified that there was "a followup inspection and still found the stairs to be okay." (Id. at 21.) At his deposition, Mr. Barr examined a photograph of the steps and said that ""From this angle you can see the step is angled up a little bit" and "you can see some deterioration in the step." (Id. at 28.)

Mr. Chitwood also testified at his deposition that he found nothing wrong with the steps. (Mar. 25, 2014, Dep. of Robert Chitwood (Docket Entry No. 78-13).) He stated that they were not too rickety and that "I've been out there and looked at the stairs and I didn't really find a problem with them." (Id. at 10, 32.) When examining a photograph of the steps Mr. Chitwood stated that it appears the step is lower

23

AO 72A
(Rev.8/8

in the back of it than it is in the front, but that "I don't believe it would   cause somebody to walk off the side of the stairs." (Id. at 18-20.)

The Operations Project Manager at the Project, Steve Logan, also inspected the stairs and testified at a deposition. (Mar. 7, 2014, Dep. of Steve Logan (Docket Entry No. 78-18.).) Mr. Logan, discussing his impression of the stairs, testified: "[T]here didn't seem to be any disrepair.  They were sturdy.  They had been there for a few years.  I couldn't tell if anything was wrong with them." (Id. at 8.) Mr. Logan also looked at a photograph of the steps and said that he saw "a hole" in the corner of the step and that the tread in the step should be more level.  (Id. at 13-14.)

24

Additionally, Mr. Hill also testified about inspecting the steps. (Hill Dep.) He stated that he did not see anything wrong with the stairs, and he did not recall the third step being tilted. (Id. at 12-13.) Plaintiff quotes Mr. Hill as saying that "Step 3 'is a problem, yeah, we need to fix it.'" (PRDSMF ¶ 24 (quoting Hill Dep. at 18).) That full exchange, however, was: "Q. Do you think the step number three ought to be repaired? A. If that's a problem, yeah, we need to fix it." (Hill Dep. at 18.)

## B. Procedural Background

The Court incorporates the procedural background given in its July 18, 2013, Order as if set forth fully herein and adds only those background facts that are relevant to the instant Order. (July 18, 2013, Order (Docket Entry No.

AO 72A

(Rev.8/8
2)

33).) On September 4, 2014 Defendant filed its Motion for Summary Judgment. (Docket Entry No. 78.) The briefing process for the Motion for Summary Judgment is complete, and the Court therefore finds that the Motion is ripe for resolution by the Court.

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Deen v. Egleston, 597 F.3d 1223, 1228 (11th Cir. 2010) (noting that in making this determination, courts should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

26

AO 72A
(Rev.8/8
2)

affidavits" (citation and quotation marks omitted)). The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate, and may satisfy this burden by pointing to materials in the record. <u>Reese</u>, 527 F.3d at 1269 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)); <u>Allen v. Bd. of Public Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1313 (11th Cir. 2007).

The precise standard for evaluating a summary judgment motion depends on whether the movant bears the burden of proof at trial on the relevant issue. "[W]here the moving party has the burden [of proof on the issue, the] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." <u>United States v. One 2007 Toyota FJ Cruiser, VIN</u>

27

AO 72A
(Rev.8/8
2)

JTEBU11F670023522, 824 F. Supp. 2d 1369, 1376 (N.D. Ga. Nov. 8, 2011) (citations omitted)); see also Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1243 (11th Cir. 2001) ("The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (citation omitted)). As the United States Court of Appeals for the Eleventh Circuit has stated:

> In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with

AO 72A
(Rev.8/8
2)

significant, probative evidence demonstrating the existence of a triable issue of fact.

United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in State of Ala., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). By contrast, "[w]hen the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." One 2007 Toyota FJ Cruiser, VIN JTEBU11F670023522, 824 F. Supp. 2d at 1376 (citations omitted).

Once the moving party has supported its motion adequately, the non-movant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial. Allen, 495 F.3d at 1314. The non-movant

29

AO 72A
(Rev.8/8
2)

must "go beyond the pleadings" and establish these facts "by its own affidavits, or by depositions, answers to interrogatories, and admissions on file." Id. (citation and internal quotation marks omitted).

Here, Defendant does not bear the burden of proof at trial on Plaintiffs' claims. Therefore, Defendant need only prove that Plaintiff cannot sustain his burden of proof as to any essential element. If Defendant is successful, Plaintiff then must establish a genuine issue of material fact as to that element.

In resolving the instant Motion, the Court notes that it may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, assess the

AO 72A
(Rev.8/8
2)

quality of the evidence presented, or make factual findings. <u>Reese</u>, 527 F.3d at 1271.

## III. Discussion

### A. Premises Liability and the Georgia Recreational Property Act

While sovereign immunity typically shields the government from claims for damages, the FTCA waives that immunity

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Defendant is thus "liable to suit only in the same manner and to the same extent as a private

31

individual in like circumstances under the law of the place where the act or the omission occurred." <u>Massey v. United States</u>, 733 F.2d 760, 763 (11th Cir. 1984); <u>see also</u> <u>Kitchens By & Through Kitchens v. United States</u>, 604 F. Supp. 531, 534 (M.D. Ala. Mar. 6, 1985) (following <u>Massey</u> and thus applying Alabama's law on premises liability for a landowner to the federal government).

### 1.    Georgia Premises Liability Law

The applicable duty of care in this case is that of an owner or occupier of land to an invitee.  O.C.G.A. § 51-3-1 provides:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

32

O.C.G.A. § 51-3-1. The Supreme Court of Georgia has held that in premises liability cases there are two decisive elements that an invitee must prove: "(1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier." Robinson v. Kroger Co., 268 Ga. 735, 748, 493 S.E.2d 403, 414 (1997). "An owner/occupier is on constructive notice of what a reasonable inspection would reveal." Jackson v. Waffle House, Inc., 245 Ga. App. 371, 373, 537 S.E.2d 188, 191 (2000). Furthermore, "the plaintiff's evidentiary proof concerning the second prong is not shouldered until the defendant establishes negligence on the part of the

33

plaintiff-i.e., that the plaintiff intentionally and unreasonably exposed self to a hazard of which the plaintiff knew or, in the exercise of ordinary care, should have known." Id. The Supreme Court of Georgia further held that "routine issues of premises liability, i.e., the negligence of the defendant and the plaintiff, ... are generally not susceptible of summary adjudication, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed." Id. (internal quotation marks omitted).

### 2. Georgia's Recreational Property Act

Defendant argues, however, that the Campground falls within Georgia's Recreational Property Act ("RPA") which limits the liability of owners who make their land available to the public for recreational purposes. O.C.G.A. § 51-3-20 et.

34

seq. The RPA states that "an owner of land owes no duty

of care to keep the premises safe for entry or use by others

for recreational purposes or to give any warning of a

dangerous condition, use, structure, or activity on the

premises to persons entering for recreational purposes."

O.C.G.A. § 51-3-22. Furthermore, the RPA says, with a few

exceptions, that:

> an owner of land who either directly or indirectly
> invites or permits without charge any person to use
> the property for recreational purposes does not
> thereby:
>
> (1) Extend any assurance that the premises
> are safe for any purpose;
>
> (2) Confer upon such person the legal status
> of an invitee or licensee to whom a duty of care is
> owed; or

(3) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

O.C.G.A. § 51-3-23.

O.C.G.A. § 51-3-25 provides an exception to § 51-3-22 and § 51-3-23 when liability exists "[f]or willful or malicious failure to guard or warn against a dangerous condition" or "[f]or injury suffered in any case when the owner of land charges the person or persons who enter or go on the land for the recreational use thereof." O.C.G.A. § 51-3-25. The RPA defines "charge" as "the admission price or fee asked in return for invitation or permission to enter or go upon the land." O.C.G.A. § 51-3-21(1). The statute also defines "recreational purpose" as including but not limited to "hunting, fishing, swimming, boating, camping, picnicking,

36

hiking, pleasure driving, aviation activities, nature study, water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites." O.C.G.A. § 51-3-21(4).

### 3. Analysis of the Charge Exception

Plaintiff and Defendant agree that "[f]or the charge to constitute an admission fee it must be established that it is imposed in return for recreational use of the land." <u>Majeske v. Jekyll Island State Park Auth.</u>, 209 Ga. App. 118, 119, 433 S.E.2d 304, 305-06 (1993). The Court therefore must determine whether the fee paid by Plaintiff was for the recreational use of the land. If the fee was for recreational use of the land, then this case falls within the O.C.G.A. § 51-3-25 exception, and Georgia's usual standard for a

37

landowner's liability applies. Generally, "determination of the purpose for which the public [was] permitted on the property, involves the examination and weighing of evidence....it is for the fact finder to resolve the conflict." Atlanta Comm. for Olympic Games, Inc. v. Hawthrone, 278 Ga. 116, 117, 598 S.E.2d 471, 473-74 (2004) (alteration in original) (citations and internal quotation marks omitted) (discussing a dispute in which the property had both commercial and recreational aspects). "[S]ummary adjudication of this issue is appropriate only in plain and palpable cases where reasonable minds cannot differ as to the conclusion to be reached." Id., 278 Ga. at 118, 598 S.E.2d at 474 (citations and internal quotation marks omitted).

38

AO 72A
(Rev.8/8
2)

The Supreme Court of Georgia has held that a fee was only for a parking permit and not an admission fee for recreational use when the two dollar fee was charged for each vehicle entering the park but did not vary based on the number of people in the car and did not apply to people entering the park on foot. Stone Mountain Mem'l Ass'n v. Herrington, 225 Ga. 746, 171 S.E.2d 521 (1969). The Court of Appeals of Georgia in Majeske found that a one dollar fee per vehicle entering the island was a parking fee and not a charge under the RPA. Majeske, 209 Ga. App. at 119, 433 S.E.2d at 305-06. In Majeske, the facilities were open to the general public; the parking fee did not vary based on the number of people in the vehicle or the type of vehicle; and no fee was charged for entering the island by a means other

39

AO 72A
(Rev.8/8

than a car, including by foot, boat, aircraft, or non-motorized vehicle. Id. Parking fees are not "charges" and thus do not take away immunity under the RPA. Id.; see also Lowry v. Cochran, 305 Ga. App. 240, 245, 699 S.E.2d 325, 330 (2010) ("Here, admission...consisted of a nominal parking fee. We have already found...that such a fee does not waive immunity under the Recreational Property Act.").

In Hogue v. Stone Mountain Mem'l Ass'n, 183 Ga. App. 378, 358 S.E.2d 852 (1987), the court concluded a four dollar fee did not constitute a charge for recreational use of the park but was instead a motor vehicle fee. In that situation, plaintiffs received a car sticker in exchange for the fee that allowed them to leave and re-enter the park, including with more people, without an additional charge. Id.

40

at 380, 358 S.E.2d at 854.[1]  The Hogue court also decided

that an additional purchase of a camping permit was not a

charge for the recreational use of the park because other

activities such as swimming and sightseeing were available

without charge.  Id.

In other cases, courts have further limited the meaning

of a charge under the RPA.  Having to pay a fee for hunting

and wildlife management licenses does not constitute a

---

[1]Quick v. Stone Mountain Mem'l Ass'n, relying on
Hogue, also found the four dollar fee at Stone Mountain did
not bar application of the RPA. 204 Ga. App. 598, 598-99,
420 S.E.2d 36, 38 (1992) ("As in Hogue, uncontradicted
evidence in the record shows that the $4 fee is charged to
each vehicle entering the park regardless of the number of
occupants of the vehicle. 'It follows that the trial court was
authorized to conclude as a matter of law that this fee did
not constitute a charge for the recreational use of the
parkland itself.'") (quoting Hogue, 183 Ga.App. 380, 358
S.E.2d at 854).

AO 72A
(Rev.8/8
2)

charge when access for recreational purposes and permits to hunt on the property are free.  <u>Lee v. Dep't of Natural Res.</u>, 263 Ga. App. 491, 492, 588 S.E.2d 260, 262-63 (2003).  A little league registration fee, that can be waived for children in need and that covers the costs of running the league, is not an admission fee.  <u>S. Gwinnett Athletic Ass'n, Inc. v. Nash</u>, 220 Ga. App. 116, 117-18, 469 S.E.2d 276, 277 (1996); <u>see also</u> <u>Gayle v. Frank Callen Boys & Girls Club, Inc.</u>, 322 Ga. App. 412, 414 15, 745 S.E.2d 695, 697-98 (2013) (finding voluntary membership fee was not an admission fee).

Several other cases have dealt with fees for use of a campground.  In a Georgia case, "a nominal fee for use of the campsite" was not a charge for admission for

42

recreational use under the RPA when there was no fee to enter the park itself. <u>Graham v. Dep't of Army</u>, No. 1:13 CV 0033, 2014 WL 4674989, at *2 (S.D. Ga. Sept. 18, 2014). A Pennsylvania court, applying a similar Pennsylvania statute, also found that a fee to use the campground did not remove the defendant from the protections of Pennsylvania's recreational use act. <u>Flohr v. Pa. Power & Light Co.</u>, 800 F. Supp. 1252, 1256 (E.D. Pa., Mar. 19, 1992). In <u>Flohr</u>, the court held that:

> [P]laintiffs did not pay a fee in exchange for permission to enter the Otter Creek Recreation Area for the purpose of pursuing recreational activities. Rather, plaintiffs paid a fee in order to use the campsite at Otter Creek for the weekend. If plaintiffs had only come to Otter Creek for the day, it is undisputed that they could have used the recreational facilities and fished at the accident site free of charge. Therefore, the camping fee paid by plaintiffs was not a quid pro quo in exchange for

43

permission to enter Otter Creek at the time plaintiffs were fishing.

Id. On a motion for reconsideration, the plaintiffs presented evidence that the campground extended to the area where the injury occurred and a brochure stating "that payment of a fee to enter the campground includes all the recreational activities in the park." Flohr v. Pa. Power & Light Co., 821 F. Supp. 301, 305 (E.D. Pa. Mar. 5, 1993). The Pennsylvania court rejected that evidence as a grounds for reconsideration because the evidence did not change the fact that "[i]f plaintiffs had only come to Otter Creek for the day, it is undisputed that they could have used the recreational facilities and fished at the accident site free of charge." Id.

44

AO 72A
(Rev.8/8
2)

In this case, Plaintiff has a difficult burden to sustain a claim in light of the RPA as Plaintiff has not pointed to a single case where a court, in Georgia or otherwise, held that fee charged by an owner of a recreational area fell within the RPA's exception. On several facts, this case can be distinguished from those cases. Generally, people cannot use the Campground without paying. There is a visitor use fee for day visitors. There is even no free day use in the campground. Additionally, Plaintiff's accident occurred in the campground area, where Plaintiff would not have otherwise been if Plaintiff were not a camper or a visitor of a camper.

On the other hand, this case is similar to those addressed by other courts. Plaintiffs had to pay a fee to use

AO 72A
(Rev.8/8
2)

the Campground, but people could enter the rest of the Project for free. Other recreational activities were free, including swimming, boating, hiking, sightseeing, picnicking, pleasure driving, and nature study. The fee for using the campground was per vehicle, not per person. Also, the fee was implemented to pay for special services, namely vehicle hookups that provided electric, water, and sanitation services to campers. The fee was instituted not for the Corps to profit from but to recoup a portion of the expenses of providing those special services.

For the above reasons, this case is analogous to those where the RPA was found to apply. The purpose of the RPA "is to encourage owners of land to make land and water areas available to the public for recreational purposes

46

by limiting the owners' liability toward persons entering thereon for recreational purposes." O.C.G.A. § 51-3-20. Given this clear statutory purpose, that the Parties largely do not dispute the facts of this case, and the fact that no Georgia courts have found the § 51-3-25 charge for admission for recreational use exception to apply, the Court concludes that Defendant falls under the ambit of the RPA.

### 4. Application of the RPA Standard of Liability

Because the RPA applies to Defendant, the Court applies the standard of liability set out in that statute. Plaintiff bases his claim on the premise that the Corps and its contractor failed to inspect the stairs at campsite 26 and thus failed to keep the Campground in a safe condition for use. O.C.G.A. § 51-3-22 provides that the owner "owes no

47

duty of care to keep the premises safe...or to give any warning of a dangerous condition." O.C.G.A. § 51-3-22 (emphasis added). The duty owed under the RPA is even narrower than the duty owed to a licensee which does not include a duty to inspect the premises and only makes the owner liable for wanton and willful injury. Nye v. Union Camp Corp., 677 F. Supp. 1220, 1223-24, 1226 (S.D. Ga. Oct. 30, 1987). Here, the Corps and Anderson actually performed some inspections of the Campground and there is no evidence of willful misconduct. The Court therefore concludes that Defendant is not liable under the RPA, and the Court grants Defendant's Motion for Summary Judgment on that ground.

48

## B.  FTCA and Respondeat Superior

Counts II Plaintiff's Amended Complaint asserts that Defendant is liable for the negligence of its contractor, Anderson, because the Corps retained the right to control the time and manner of work done; in other words, Anderson was an employee of Defendant. (Amd. Compl. ¶¶ 16-17, 18-19 (citing O.C.G.A. § 51-2-5(5),(6)).) Defendant argues that the FTCA does not waive sovereign immunity against claims relying on respondeat superior for acts of independent contractors and thus that Count II is barred by sovereign immunity.

"It is well settled that sovereign immunity bars suit against the United States except to the extent that it consents to be sued." Means v. United States, 176 F.3d

49

AO 72A
(Rev.8/8

1376, 1378 (11th Cir. 1999). "It is equally settled that statutory waivers of sovereign immunity 'are to be construed strictly in favor of the sovereign.'" Id. (quoting McMahon v. United States, 342 U.S. 25, 27 (1951)).

The FTCA provides a limited waiver of sovereign immunity for actions against the federal government involving

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "Suits under the FTCA are limited to those which involve claims arising from 'the negligent or wrongful act or omission of any employee of the

50

AO 72A
(Rev.8/8
2)

Government . . . acting within the scope of his office or employment.'" Tisdale v. United States, 62 F.3d 1367, 1371 (11th Cir. 1995) (quoting 28 U.S.C. § 1346(b)). "The FTCA specifically excludes 'any contractor with the United States' from its coverage." Id. (quoting 28 U.S.C. § 2671). "Thus, the United States is not liable for the acts or omissions of the independent contractors that it employs." Id.

The Court uses a "control" test to determine whether an individual is an employee of the Government for purposes of the FTCA. Patterson & Wilder Constr. Co. v. United States, 226 F.3d 1269, 1274 (11th Cir. 2000). "Under this test, a person is an employee of the Government if the Government controls and supervises the day-to-day activities of the alleged tortfeasor during the relevant time."

51

AO 72A
(Rev.8/8
2)

Id. "Notably, it is not necessary that the Government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of the task." Id. In Patterson, the Eleventh Circuit reversed a grant of summary judgment because the plaintiff had "come forward with enough evidence for a reasonable factfinder to conclude that [the contractors]—having been retained not just to perform a particular task, but to perform it in a particular way at a particular location at a particular time in accordance with the Government's precise instructions—were sufficiently under the Government's control to be deemed employees." Id. at 1278.

Defendant sets forth a number of facts by which a reasonable finder of fact could decide that it did not exercise

52

control over Anderson and thus that Anderson was an independent contractor and not an employee. First, the Corps did not exercise control over Anderson on a daily basis. Second, the Corps largely did not control how Anderson accomplished a given task. Third, Anderson generally set priority for its tasks. Fifth, most of the requirements on Anderson were based on the requirements of the Contract not on the Corps' control of Anderson. <u>See e.g.</u>, <u>Walton v. United States</u>, 484 F. Supp. 568, 574 (S.D. Ga. Feb. 14, 1980) ("The reservation of a right to supervise work done under contract with the Government is not necessarily an indication that the employer is not an independent contractor."). Sixth, requiring Anderson to follow the Corps' regulations and manuals is not the same

53

AO 72A
(Rev.8/8
2)

as exercising control over it.  Seventh, Anderson provided some of its own vehicles and equipment.

On the other hand, there are a number of facts suggesting that Defendant did control Anderson and thus that Anderson is an employee of Defendant.  First, the Corps regularly inspected Anderson's work.  Second, the Corps supervised and evaluated Anderson's work. <u>Cannady v. United States</u>, 155 F. Supp. 2d 1379, 1383 (M.D. Ga. Aug. 14, 2001) ("Certainly, no representative of the United States directly oversaw her daily work activities, but continuous supervision is not required.").  Third, there were weekly meetings in which representatives of the Corps and Anderson discussed what work needed to be done.  Fourth, the Corps occasionally set the priority in which Anderson's

54

work was to be done. Fifth, the Corps issued work orders for Anderson. Sixth, the Corps required Anderson to create a Quality Control Plan, which the Corps evaluated. Seventh, the Anderson Contract required Anderson to comply with a large number of Corps regulations and manuals that described how to do certain tasks. Canady, 155 F. Supp. at 1383 ("finding evidence of an employment relationship when the employee's "work practices were dictated by USDA handbooks, bulletins, and mailings, and the purpose of her work was to carry out USDA programs."). Eighth, the Corps provided Anderson with the vehicles and equipment necessary to carry out its work. Ninth, Anderson had to ask the Corps for permission to make certain, large expenditures in carrying out its tasks.

55

Based on the foregoing facts, a fact finder could reasonably conclude that, as in <u>Patterson</u>, Anderson was an employee of Defendant. The Court therefore finds that Plaintiff is entitled to proceed as to Count II and denies Defendant's Motion for Summary Judgment to that extent.

## C.  Discretionary Function Exception

Count III of the Amended Complaint asserts that Defendant is liable because it ratified the wrongdoings of its contractor, Anderson. (Amd. Compl. ¶¶ 18-19.) Defendant argues that its acts fall within the discretionary function exception to the FTCA. "The Supreme Court has created a two-part test for assessing whether a government employee's actions constitute a discretionary function: (1) that the action must involve an element of 'judgment or

56

choice'; and (2) if it does, 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" <u>Slappey v. U.S. Army Corps of Engineers</u>, 571 F. App'x 855, 857 (11th Cir. 2014) (quoting <u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988)).

For step one, the Court "must assess whether the Corps's conduct violated a specific nondiscretionary mandate that allowed no judgment or choice." <u>Id.</u> "'The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" <u>Id.</u> (quoting <u>United States v. Gaubert</u>, 499 U.S. 315, 322 (1991)). In this case, Plaintiff has pointed to no federal statute, regulation, or policy that specifically prescribes how the Corps is to

57

supervise its contractors or approve their work. Nor does Plaintiff refer to any such federal rule that directs how or when the Corps should repair stairs in a campground. In this way, the present case can be distinguished from <u>Phillips v. United States</u>, 956 F.2d 1071 (11th Cir. 1992) on which Plaintiff relies. In <u>Phillips</u>, the Eleventh Circuit decision turned on the fact that employees of the Corps failed to follow the mandatory directives of the Corp's Safety Manual. 956 F.2d at 1076-77. Here, Plaintiff has not provided evidence of a manual or regulation that the Corps has failed to follow.

Plaintiff's response to this argument is "that Defendant failed to fulfill its mandatory safety responsibilities owed to invitees under Georgia law." (Pl. Br. Resp. Mot. Summ. J.

AO 72A
(Rev.8/8
2)

(Docket Entry No. 85) at 23.) A state law liability statute, however, is not sufficient to show a lack of judgment or choice, as it would still leave discretion over how to maintain a safe premises. The Court has also concluded that the RPA applies in this case and thus the Corps has very little duty to maintain the safety of its premises. Finally, a state law is not "a federal statute, regulation, or policy" which is what is required to create a "nondiscretionary mandate" on a federal agency. <u>Slappey</u>, 571 F. App'x at 857.

The Court therefore concludes that the Corps' conduct involved an element of judgment or choice. Plaintiff's case thus fails as to prong one of the discretionary function exception.

AO 72A
(Rev.8/8
2)

Because the Court concludes the Corp's conduct is a discretionary function, the Court must address prong two of the discretionary function exception. "At the second step of the discretionary function test, 'assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.'" Slappey, 571 F. App'x at 859-60 (quoting Berkovitz, 486 U.S. at 536). "The exception is intended to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" Id. at 860 (quoting Berkovitz, 486 U.S. at 536). The Court "must 'look to the nature of the challenged decision in an objective, or general

AO 72A
(Rev.8/8
2)

sense, and ask whether that decision is one we would expect inherently to be grounded in considerations of policy.'" Id. (quoting Autery v. United States, 992 F.2d 1523, 1530 (11th Cir.1993)). "If the policy or guideline allows for discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" Id. (quoting Gaubert, 499 U.S. at 324).

The conduct at issue in this case is the decision of the Corps and Anderson either not to inspect or not to repair the stairs at Campsite 26. Plaintiff's only argument as to this second prong is that "decisions made at the operational level, i.e., the judgment and decision-making involved in the day-to-day management of a recreational area, are not protected and are not the sort of decision-making

61

contemplated by the discretionary function exemption."[2] (Pl. Br. Resp. Mot. Summ. J. at 21-22.) Plaintiff cites <u>Mandel v. United States</u>, 793 F.2d 964, 967-68 (11th Cir. 1986) for this proposition. The Supreme Court, however, rejected this distinction between the operational level and the planning level, holding that discretionary conduct could occur at the operational level and that courts must look at the nature of the action rather than the position of the actor in determining whether the discretionary function exception applies. <u>Gaubert</u>, 499 U.S. at 325.

---

[2]Defendant, on the other hand, offers the conclusory statement that "these choices and decisions are grounded in discretion and policy" (Def. Br. Supp. Mot. Summ. J. (Docket Entry No. 78-1) at 22), but neglects to say what specific policy consideration were at play in this case.

AO 72A
(Rev.8/8
2)

Other courts have held that other, seemingly small, day-to-day type decisions do fall within the discretionary function exception. The United States Postal Service's decision resulting in a lack of security outside one of its locations falls within the exception. Hughes v. United States, 110 F.3d 765, 769 (11th Cir. 1997) ("While financial considerations alone may not make a decision one involving policy, such considerations are particularly relevant to the Postal Service, which is operated as a basic and fundamental service provided to the people. We will not second guess the Postal Service's resource allocation decisions here." (internal quotation marks and citation omitted)). The manner in which the Coast Guard boards and inspects a vessel, even when doing so causes damage to the vessel,

63

falls within the exception. <u>Mid-S. Holding Co. v. United States</u>, 225 F.3d 1201, 1206-07 (11th Cir. 2000) ("Because no statute or corresponding regulation prescribes the methodology for boarding or searching a vessel, field agents are left to their discretion to devise the best course for executing these functions." (footnote omitted)). Furthermore, "discretionary actions in furtherance of a policy decision are within the scope of the exception." <u>Id.</u> at 1206.

As in those cases, the operation of the Campground is done as a service to the public, financial concerns can come into play, and no statute or regulation directs how or when to inspect or repair stairs at a campsite. Based on those facts, Supreme Court precedent rejecting Plaintiff's key argument, and the presumption in favor of finding the

64

conduct was grounded in policy, the Court concludes that Plaintiff failed to meet his burden and cannot overcome the discretionary function exception. The Court thus grants Defendant's Motion for Summary Judgment as to Count III of Plaintiff's Amended Complaint.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART** and **DENIES IN PART** Government's Motion for Summary Judgment [78]. The Court **GRANTS** the Motion as to Count I and Count III and **DISMISSES** those claims. The Court otherwise **DENIES** the Motion.

The Court **ORDERS** Plaintiff and Defendant to file their proposed consolidated pretrial order **WITHIN THIRTY (30) DAYS**. The Court **DIRECTS** the Clerk to place this case on

AO 72A
(Rev.8/8
2)

the Court's next available trial calendar following the submission of the pretrial order.

All motions in limine are due no later than fourteen calendar days prior to the date on which the trial of this case is scheduled to begin. Absent a showing of good cause, the Court will not consider untimely-filed motions in limine.

IT IS SO ORDERED, this the 17 day of November, 2014.

UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/8
2)